UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


INEZ HUNTER,                                    CIVIL NO. 08-4980 (PJS/JSM)

           Plaintiff,

v.                                              REPORT AND RECOMMENDATION

FORD MOTOR COMPANY,
CITI FINANCIAL AUTO,
HASTINGS AUTOMOTIVE INC.,
DION CARPENTER,
DOUG ERICKSEN, and
JOHN DOES,[1]

           Defendants.

       The above matter came on before the undersigned upon plaintiff's Motion and

Request for Summary Judgment [Docket No. 131]; plaintiff's Motion and Request for

Sanctions for Utilizing the Court System as a Loan Sharking Arena in Violation of Civil

Code § 1916.3 [Docket No. 136]; plaintiff's Motion for Briefing Schedule/Hearing for a

Permanent Injunction [Docket No. 139]; defendant Citi Financial Auto and Tony Feell's

Motion for Summary Judgment [Docket No. 156]; defendant Ford Motor Company's

Motion for Summary Judgment [Docket No. 171]; Motion of Hastings Automotive, Inc.,

Dion Carpenter and Doug Ericksen for Summary Judgment [Docket No. 178]; and

plaintiff's Motion for Citizen's Arrest of Dion Carpenter [Docket No. 211].

       Plaintiff appeared pro se.  Brian L. Vander Pol, Esq. appeared on behalf of

defendant Ford Motor Company; David K. Cole, III Esq. and Kelly W. Hoversten, Esq.

---

[1]     While not named in the caption, the following other individuals were named as
defendants in this case:  Tony Feell ("Feell"), President of Citi Financial Auto ("CFA");
and Alan Mulally ("Mulally"), President and Chief Executive Officer for Ford.  See
Amended Complaint, [Docket No. 94-1], ¶¶ 8, 15.

appeared on behalf of defendant Citi Financial Auto; and Mark Scholle, Esq. appeared on behalf of defendants Hastings Automotive Inc., Dion Carpenter and Doug Ericksen.

This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

## I. BACKGROUND

### A. <u>Present Status of Case</u>

In her original Complaint [Docket No. 1], plaintiff Inez Hunter ("Hunter") asserted six causes of action against the following defendants: Ford Motor Company ("Ford"); CFA; Hastings Automotive Inc. ("HAI"), Dion Carpenter ("Carpenter"), the sales manager for HAI, and Doug Ericksen ("Ericksen"), the owner and CEO of HAI (collectively HAI, Carpenter and Ericksen are referenced as the "HAI defendants"), and Chrysler L.L.C. ("Chrysler").[2] These six causes of action were titled by Hunter as follows:

1. Race, Gender and Disability Discrimination in Violation of Equal Credit Opportunity Act, 15 U.S.C. 1691, <u>et</u> <u>seq</u>.;

2. Americans With Disability Act – 42 U.S.C. § 12182, <u>et</u> <u>seq</u>., and the Vulnerable Adult Act;

3. Civil Rights Act: Racial Discrimination, 42 U.S.C. § 1981, § 1982, <u>et</u> <u>seq</u>., and Human Rights Act Chapter 363a <u>et</u> <u>seq</u>.;

4. Uniform Deceptive Trade Practice Act, Minn. Stat. §§ 325D.43 to 325D.48, 325D.68 to 325D.69 <u>et</u> <u>seq</u>., §§ 325F.69, 325F.71; False Statements in Advertising Act, Minn. Stat. §§ 325F.67 to 325F.70; Minn. Stat. § 325D.09--Unlawful Trade Practices; Consumer Protection Act; and Breach of Implied Covenant of Good Faith and Fair Dealing;

---

[2] Chrysler filed for bankruptcy on April 30, 2009, which has resulted in proceedings against Chrysler being stayed as of that date under 11 U.S.C. § 362(a)(1).

5.      Business and Professions Code Sect. §§ 17200, 17208, Consumer Fraud Act, Human Rights Act, 363A.01, 363A.02, 363A.04, 363A.20, 363A.12, 363A.16; (Unlawful Business Practices); and

6.      Truth in Lending Act, 15 U.S.C. § 1601, <u>et</u> <u>seq</u>.

<u>See</u> Complaint [Docket No. 1].

Ford moved to dismiss these claims under Rule 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure. After review of Hunter's objections to this Court's Report and Recommendation on these motions [Docket No. 86], District Judge Patrick Schiltz granted Ford's Motion to Dismiss in its entirety and with prejudice as it related to Hunter's Second and Sixth Causes of Action. <u>See</u> July 21, 2009 Order [Docket No. 112] at pp. 7-8. The District Court also dismissed Hunter's Fifth Cause of Action against Ford with prejudice, except as to those claims arising under Minn. Stat. § 363A.16. <u>Id.</u> at p. 7.

As to Hunter's Fourth Cause of Action, the District Court dismissed with prejudice all of Hunter's claims against Ford under Minn. Stat. §§ 325D.43 to 325D.48, 325D.68 to 325D.69, 325F.67 to 325F.70, and Hunter's claim against Ford for breach of implied covenant of good faith and fair dealing. <u>Id.</u> at p. 7. The District Court dismissed without prejudice all of the claims against Ford under Minn. Stat. §§ 325D.09 and § 325F.71 as to all alleged misrepresentations described in the Complaint, except for two statements allegedly made by defendant Carpenter and described by the District Court as follows:

> The first sufficiently particular statement is as follows:
>
> Defendants [sic] Ericksen authorized Carpenter, and ... John Does I through X employed at HAI, CFA, Ford and Chrysler to use false and misleading statements that after SIX months Hunter could refinance the car and receive a substantially lower interest rate.... [T]hey knew or should have known Hunter could not receive new financing after six months because of excessive prepayment penalties which effectively prohibit borrowers from refinancing at a

fairer rate, and they knew or should have know she was considered "Up-Side Down."

Compl. ¶ 66.

* * *

The second sufficiently particular statement is as follows: "Defendant Carpenter made false and misleading statements that the Plaintiff could not afford a brand new car, even when it was not true, and charged her the cost of a brand new car." Compl. ¶ 62.

Id. at pp. 4, 5, 7. The District Court concluded that these two statements were pled with sufficient particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. Accordingly, it denied Ford's motion to dismiss Hunter's Fourth Cause of Action as to these two statements pursuant to Minn. Stat. § 325D.09 of the Unlawful Trade Practices Act, and Minn. Stat. § 325F.71 of the Deceptive Acts Perpetrated Against Senior Citizens or Disabled Persons Act.

Thus, based on the District Court's decision, the only claims against Ford that survived Ford's motion to dismiss were Hunter's First (Equal Credit and Opportunity Act claim) and Third Causes of Action (Discrimination under 42 U.S.C §§ 1981 and 1982), the Fourth Cause of Action based on Minn. Stat. §§ 325D.09 and 325F.71 (limited to the two statements by Carpenter described above), and Hunter's claims under the Fifth Cause of Action based on Minn. Stat. § 363A.16. As to CFA and the HAI defendants, all six causes of action asserted in the original Complaint were still actionable.

Subsequently, Hunter filed a motion to amend the Complaint [Docket No. 98]. The proposed amended complaint omitted the claims under the Americans with Disability Act – 42 U.S.C. § 12182, et seq., and the Vulnerable Adult Act; claims under §§ 17200 and 17208 of the California Business and Professions Code; and claims

under MHRA, §§ 363A.01, 363A.02, 363A.04, 363A.10 and 363A.12.[3]  See proposed amended complaint [Docket No. 94-1]

The Court granted Hunter's motion to amend in part and denied it in part.  See November 12, 2009 Order [Docket No. 144].  The amended claims allowed by the Court included:

- An implied covenant of good faith and fair dealing claim against CFA and the HAI defendants.

- Claims against all defendants under Minn. Stat. §§ 363A.16[4] and 363A.17.

Id. at pp. 30-31; see also proposed amended complaint [Docket No. 94-1], ¶¶ 123-125.

As to Hunter's claims of fraudulent and deceptive trade practices under Minn. Stat. §§ 325D.09 and 325F.71, in addition to the two statements allegedly made by Carpenter described above, the Court allowed Hunter to amend her Complaint to add the following alleged acts of fraud against her in violation of these statutes:

- HAI employees Carpenter and Ericksen, Ford CEO Mulally and CFA employee Feell fraudulently proclaimed and concealed available Ford Taurus inventory (specifically that that neither Ford nor its authorized dealerships had any new Ford Taurus vehicles in stock), in order to obstruct Hunter from entering into a contractual relationship under the Ford Z-Plan and at the same time gave her unfavorable terms under a loan packing scheme.  See November 12, 2009 Order [Docket No. 144] at p. 33 (citing proposed amended complaint ¶¶ 123, 128 (in conjunction with ¶¶ 47, 48, 50, 51, 60, 61, 62, 64-68, 96, 100, 130(2)).

- "Carpenter lied to and told her that that she could not afford a new vehicle."  Id. at pp. 34, 36 (citing proposed amended complaint ¶ 129) (in conjunction with ¶¶ 47, 48, 50, 62 and 67)).

---

[3]    These claims had been dismissed as they pertained to Ford (see July 21, 2009 Order at p. 7), but until Hunter filed her proposed amended complaint deleting them altogether, they had still been viable as to the HAI defendants and CFA.

[4]    Hunter had previously asserted a claim in the original Complaint under Minn. Stat. § 363A.16 in the Fifth Cause of Action, which survived Ford's Motion to Dismiss. See Order dated July 21, 2009 [Docket No. 112], p. 7.

- Carpenter and Ericksen concealed the terms of the "Loan Packing GAP Insurance Scam" imbedded with a 22.25% interest rate. Id. at pp. 35, 36 (citing proposed amended complaint ¶ 130(3) (in conjunction with ¶¶ 53, 85)).

- Carpenter scammed her as it related to the value of her 2003 Ford Taurus, by increasing the cost of her vehicle over its value. Id. at p. 36 (citing proposed amended complaint ¶ 62).

- Carpenter and Ericksen made false statements to the effect that that they would accept her Ford Thunderbird as a trade-in for $2,500. Id. at p. 36 (citing proposed amended complaint ¶ 50).

- Carpenter made a false and misleading statement that she could refinance her vehicle in six months and receive a lower interest rate. Id. at p. 36 (citing proposed amended complaint ¶¶ 67, 130(1), (4), (7)).

The Court ordered Hunter to file and serve an amended complaint consistent with the November 12, 2009 Order on the motion to amend. See January 7, 2010 Order [Docket No. 155]. However, in violation of the Order, Hunter did not do as instructed. Instead, she filed an amended complaint that retained her claims under Minn. Stat. §§ 325D.68, 325D.69, and 325F.68 to 325F.70; included allegations of fraud not allowed by the Court; reasserted allegations under MHRA, Minn. Stat. §§ 363A.01, 363A.02, 363A.04, 363A.10 and 363A.12 and the ADA and Vulnerable Adults Act as to all defendants (save for Ford); and omitted any cause of action for deceptive trade practices in violation of Minn. Stat. §§ 325D.09 and 325F.71, which was allowed by this Court, in part, as part of her proposed Amended Complaint. See Amended Complaint, [Docket No. 162], ¶¶ 94.5-98, 122, 124, 127, 130, 132, Fifth Cause of Action. Given that the pleading filed by Hunter was not consistent with this Court's November 12, 2009 Order, the Court will treat the proposed amended complaint [Docket No. 94-1] (hereinafter "Amended Complaint"), as modified by the November 12, 2009 Order, as the operative amended complaint for the purposes of the present motions before the Court.

B.    **Factual Background**[5]

Hunter received a flier in the mail from HAI, advertising an offer to trade in her vehicle for the price of $2,500.  See Declaration of Mark Scholle ("Scholle Decl."), Ex. 1 (Transcript of the Deposition of Inez Hunter) at pp. 74-75;[6] see also Affidavit of Inez Hunter in Support of Civil Complaint[7] [Docket No. 170], pp. 9-19 of 66 ("Second Hunter Aff."), ¶ 2.  On September 28, 2007, Hunter went to the HAI dealership to purchase a vehicle with control numbers for Ford and Chrysler vehicles written by her on a pad of paper, which she claimed entitled her to a new vehicle at the price of 3% lower than the dealer's cost or a favorable leasing deal.  Id. at pp. 77, 88, 105, 113; see also Second Hunter Aff., ¶ 3.  The control number for Ford stemmed from her father's prior employment with Ford (her father was already deceased by that date), which had been given to Hunter by her sister who had called Ford claiming that she was the daughter of a Ford employee.  Id. at pp. 84-85.

The first person with whom Hunter spoke at HAI was salesperson Corey Walker ("Walker").  Id. at pp. 80-81.  Hunter and Walker discussed her interest in a new Ford or Chrysler vehicle costing no more than $30,000, Hunter communicated that she had an employee discount, and she showed Walker evidence of her income in the form of her social security disability statement and her retirement trust fund papers.  Id. at pp. 81-

---

[5]    On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

[6]    Hunter's deposition is cited as "Hunter Dep."

[7]    This affidavit, filed as part of Hunter's response to CFA's Motion for Summary Judgment, is the same affidavit filed by her on August of 2008 in support of her Complaint.  See Docket No. 2

82, 87; <u>see</u> <u>also</u> Second Hunter Aff., ¶ 4. Walker had Hunter fill out a Ford Credit Application. <u>Id.</u> at pp. 90-91, Ex. 1 (Ford Credit Application Statement).

Walker then took Hunter into the vehicle lot where she only saw used vehicles and when they returned to the showroom, Hunter asked him about the Chrysler 300 series at which time Walker turned Hunter over to another salesperson, Randy Flann ("Flann"). <u>Id.</u> at pp. 89, 92-93, 94. Flann took Hunter out to the lot and showed her one Chrysler 300 series vehicle, which cost approximately $30,000. <u>Id.</u> at pp. 94-95. Flann told Hunter that the Chrysler 300 Series would probably run about $400 per month, although he never put together the figures to determine the actual monthly payments, nor did he give her any lease options for a new vehicle. <u>Id.</u> at pp. 96, 98, 100, 105. Flann told Hunter that she could not afford these payments based on what she believed he was looking at – her social security and retirement paperwork showing an income of $1551. <u>Id.</u> at pp. 100-101. Hunter also told Flann that she could not afford a $400 per month payment. <u>Id.</u> at p. 96.

At this point, Walker came back and told Hunter he wanted to show her a used 2003 Ford Taurus and Hunter, without any objection, went to look at the vehicle. <u>Id.</u> at pp. 103-04. Hunter ultimately decided to purchase the 2003 Ford Taurus. <u>Id.</u> at pp. 107, 109.

Hunter then met with defendant Carpenter. Hunter told Carpenter that she had shown her control numbers to the salesperson and that she wanted a new vehicle; however, Carpenter had prepared all of the paperwork for the 2003 Ford Taurus and he never gave her any figures on a new vehicle. <u>Id.</u> at pp. 108-09; <u>see</u> <u>also</u> Second Hunter Aff., ¶ 4.

Hunter signed a Retail Installment Contract and Security Agreement ("Installment Contract") for the purchase of the Ford Taurus which provided that the price of the car, including sales tax, was $12,503.55. Id., Ex. 4 (Installment Contract) at p. 2. The Installment Contract also applied $2,500 as a credit for the trade-in of Hunter's Ford Thunderbird. Id.; see also Second Hunter Aff., ¶ 6. Along with some other costs, including $599 for the GAP Addendum Insurance Policy from Nation Safe Drivers, the amount to be financed by Hunter for the Ford Taurus was listed as $10,699.30. Id. The annual percentage rate listed in the Installment Contract was 22.25% and the total finance charge over the period of the loan was stated as $8,937.26. Id. at p. 1. Carpenter represented to Hunter that 22.25% was the best rate he could get her. See Second Hunter Aff., ¶ 16. The total sales price of $22,136.56 for Hunter's vehicle included the $2500 trade-in allowance, plus $10,699.30 for the amount financed, and a finance charge $8,937.26. See Hunter Dep., Ex. 4 (Installment Contract) at p. 1. The portion of the Installment Contract above Hunter's signature titled "**NOTICE TO BUYER**" instructed "[d]o not sign this agreement before you read it or if it contains any blank spaces" and stated "**BY SIGNING BELOW BUYER AGREES TO THE TERMS ON PAGES 1 AND 2 OF THIS CONTRACT AND ACKNOWLDGES RECIPT OF A COPY OF THIS CONTRACT.**" Id. (emphasis in original). Hunter testified that Carpenter went over the "figures" of the Installment Contract with her and that she signed the Installment Contract. Id. at p. 109.

The GAP insurance policy purchased by Hunter from Nation Safe Drivers and included in the purchase price of her vehicle, was designed to pay off the loan of a vehicle to the extent that the vehicle was totaled in an accident. Id. at pp. 134-35. Hunter testified that Carpenter told her that she had to have GAP insurance. Id. at pp.

109-110, 139, 166.  Hunter asserted that she did not request the GAP insurance because she already had such insurance coverage under Progressive Auto Insurance. <u>See</u> Affidavit of Inez Hunter [Docket No. 170] ("First Hunter Aff.") at pp. 2 of 66, ¶¶ 2-3. The GAP contract addendum that was signed by Hunter provided in relevant part:

> BY YOUR SIGNATURE BELOW, **YOU ACKNOWLEDGE AND AGREE THAT YOUR ACCEPTANCE OF THIS GAP ADDENDUM IS VOLUNTARY AND IS NOT REQUIRED IN ORDER FOR YOU TO OBTAIN CREDIT, DOES NOT IMPACT YOUR ABILITY TO OBTAIN AND PARTICULAR OR MORE FAVORABLE CREDIT TERMS, AND HAD NO EFFECT ON THE TERMS OF THE RELATED SALE OF THIS VEHICLE.  This coverage may decrease over the term of your financing contract and may not extend for the full term of your loan/financing contract.  You may wish to consult an alternative source to determine whether similar coverage may be obtained and at what cost.**  You also acknowledge that you have read and understand this addendum and its provisions.  No other verbal representations have been made that differ from these written provisions.

Hunter Dep., Ex. 3 (GAP Addendum) (emphasis in original).

Within 30 days of the purchase of her vehicle, Hunter's son contacted Ericksen at HAI to ask why Hunter was sold a used Ford Taurus for the same price as a new Ford Taurus vehicle, without first being shown the Z-Plan figures for a new Ford Taurus.  <u>See</u> Affidavit of Danezz Hunter, ¶¶ 1, 3, attached to Affidavit of Inez Hunter in Support of Complaint [Docket No. 2], Ex. 12.  Ericksen responded that the deal with Hunter was fair.  <u>Id.</u>, ¶ 5.  Hunter's son demanded that HAI take back the 2003 Ford Taurus and return to his mother the 1997 Ford Thunderbird or face litigation.  <u>Id.</u>, ¶ 7.  Ericksen responded that the deal was fair.  <u>Id.</u>, ¶ 8.  Later, Hunter's son spoke with Ericksen for a second time and reiterated his request that HAI take the vehicle back, and again sought a reason why his mother was not shown the Z-Plan figures.  <u>Id.</u>, ¶ 11.  Ericksen responded that they did not show her any new Ford Tauruses because HAI did not have

any in stock, as the model had been discontinued, and as to being shown Z-Plan figures for a new Chrysler, Ericksen told Hunter's son that he would fake documents to show that Hunter was shown the figures of the Chrysler 300 series.  <u>Id.</u>, ¶¶ 12, 17.  Hunter asserted defendants were required under the Z-Plan program to search other dealerships for new vehicles for her.  <u>See</u> Hunter Dep. at p. 117; <u>see</u> <u>also</u> Second Hunter Aff., ¶ 5.

Hunter testified that Carpenter told her that she could refinance the vehicle after six months from CFA, although no specific interest rate was mentioned by Carpenter. Hunter Dep. pp. 118-19; <u>see</u> <u>also</u> Second Hunter Aff., ¶ 20.

Hunter further testified that no one from CFA spoke with her and that she did not have any information that anyone from CFA knew her race or sex at the time she was offered the financing at issue.  Hunter Dep. at pp. 174-77.

Six months after the purchase of the Ford Taurus, Hunter contacted someone at CFA to inquire about refinancing the interest rate on her loan.  Hunter Dep. at 202.  The customer service representative for CFA told Hunter that CFA did not refinance after six months and that HAI was telling other customers the same thing about being able to refinance.  <u>Id.</u>

Hunter subsequently discovered that there were 2007, 2005, and 2003 Ford Tauruses available, with varying mileages ranging from 29,020 miles to 136,044 miles, of which many were priced lower than her used 2003 Ford Taurus.  <u>See</u> Affidavit of Inez Hunter [Docket No. 170] ("Third Hunter Aff.") at pp. 19-20, 22-26 of 66 (Exs. 320, 475-479).

## C.    Hunter's Argument at Hearing

Hunter made the following arguments at the hearing in support of her claims for relief:

> The facts is [sic] that I went into the dealership requesting and asking to purchase a new vehicle under either the Ford or Chrysler Plan. Hastings Automotive is an authorized dealer of Ford, as well as Chrysler. I gave them the salesman's control numbers for both Ford and Chrysler. You can only get control numbers from these companies if you have proved to them that you are a person who is in fact a person who is able to get that control number under the NVVP Plan from both Chrysler, as well as Ford. I gave them also my disability papers from Social Security Disability, my retirement papers from my employer. I requested a new vehicle from them and they were required to submit my request to both Chrysler, as well as Ford, under the NVVP Plan.
>
> They did not run the figures through either company and actually totally disregarded the control numbers that I gave them. I was then showed a used vehicle and I was coerced into purchasing a new vehicle by the salesmen and Dion Carpenter.  The markup on that used vehicle was double the amount of the Blue Book value of a 2003 Ford Taurus.  And the interest was approximately 6 to 7 percent more on a used vehicle than would have been charged on a new vehicle, by law.  I am saying that they discriminated against me because I am female, of the black race, and they did discriminate against me because of my disability. They had the papers in their hand. They also had the control numbers. If it was a Caucasian person going into a dealership, they would have done everything they could have to make sure that that person got the new vehicle that they came to purchase. HAI is an authorized dealer for both Ford and Chrysler, and they should have, if they did not have a new vehicle in stock, contacted the Ford Company, itself. Because they are authorized to purchase new vehicles from the factory, from Ford or Chrysler, either one.  They then turn around and coerced me into purchasing this 2003 Ford Taurus which is an unsafe vehicle. It had defects in it, electrical problems with the windows, the brakes, the calipers, the sprayer, the loader and the sprayer for the windshield wiper fluid is broke. And I had to have most of these items fixed.  The tires were completely bald. I had to purchase four new tires and have the brakes fixed before I

could drive the vehicle safely. In the retail installment contract when Doug Ericksen had me to sign the retail installment contract, it wasn't the fact that I couldn't afford a new vehicle, they received more money by doubling the price of the used vehicle. And actually, with the double price over the Blue Book value, as well as the interest rate, it totals out to be the same as a new vehicle. The payments would have been approximately the same amount if they had ran these figures through Ford or Chrysler. The payments would have been approximately the same amount. In the retail installment contracts I said to Dion Carpenter that I already had car insurance. He insisted that I sign the paper for the GAP Insurance, which is another insurance on top of the one that I am already paying. That equaled out to be approximately $600 more. And in fact, I submitted exhibits which was testimony to Congress to show that some dealerships are doing loan packing to increase the amount of the payments for the public. And that loan packing is over a five-year period for me, because the retail installment contract is a five-year period. At the time I did not know that this GAP Insurance was considered loan packing and is considered a felony. I went to the Hastings Police Department. I submitted an exhibit to the Court, as well as to all of the attorneys that show that this was suspicious behavior. And I consider it fraud, because I already had insurance. I have submitted to all of the attorneys my affidavit concerning this. I submitted it to the Court, as well as my son's Affidavit. The warranty on the vehicle was no good. They were contacted, HAI as well as Ford. Ford told me that if I bring the car back to a dealership, I would have to pay for an inspection. HAI did not say to bring the car back at all. They said I couldn't bring the car back. So, that was within the 30-day warranty period which was not honored. Okay. I have also submitted testimony, which is not hearsay, is testimony to Congress, to the Court, to show that dealerships are in fact doing loan packing.

It is not hearsay. They committed fraud against me, and also sold me an unsafe vehicle. I am still having the electrical problem with the windows and the sprayer for the windshield wiper fluid is still broke.

* * *

I would like to say Hastings Automotive, Dion Carpenter, knew I would be upside-down in financing that used vehicle. I am not at this time and was not in six months able to refinance. I placed a call into CFA to see if I could refinance.

> I was told by one of their service persons that they were aware that Hastings Automotive dealers, their sales people, were telling people that they could refinance after six months in order to get them to go ahead and proceed with the installment loan, and which was not true, because I was upside-down in financing. Dion Carpenter knew it at the time he had me sign that contract that I wouldn't be able to refinance when he said to me that I would. So, he knew that I wouldn't be able to. And I submitted the Blue Book value of 2003 Ford Tauruses to the Court that shows that this vehicle was double in price over the Blue Book value.

Hunter's Oral Argument at March 17, 2010 Hearing, at 8:32-9:08.[8]

## II.    STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is "no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999).  "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" DePugh v. Smith, 880 F. Supp. 651, 656 (N. D. Iowa 1995) (quoting Anderson, 477 U.S. at 248).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed.  Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th

---

[8]    No transcript of the hearing was prepared by the court reporter.  Hunter's argument can be heard from the digital recording of the hearing.

Cir. 1995). "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial." <u>Minnesota Laborers Health & Welfare Fund v. Swenke</u>, 2003 U.S. Dist. LEXIS 11439, *4-5 (D. Minn. 2003) (citations omitted); <u>see also</u> Fed. R. Civ. P. 56(e). The non-moving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy." <u>Wilson v. Int'l Bus. Mach. Corp.</u>, 62 F.3d 237, 241 (8th Cir. 1995).

When deciding a motion for summary judgment, a court can only consider admissible evidence. <u>See</u> <u>Henthorn v. Capitol Commc'ns, Inc.</u>, 359 F.3d 1021, 1026 (8th Cir. 2004); <u>see also</u> <u>Stuart v. Gen'l Motors Corp.</u>, 217 F.3d 621, 636 n. 20 (8th Cir. 2000) ("To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed. R. Civ. P. 56(e).").

## III.   ANALYSIS

### A.   Claims Under the Equal Credit Opportunity Act, 15 U.S.C. 1691, et seq. and Minnesota Human Rights Act, Minn. Stat. § 363A.16

Hunter alleged that she was systematically and arbitrarily extended car loan credit by the HAI defendants, CFA, and Ford, on a discriminatory basis in violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. 1691, <u>et</u> <u>seq.</u> and Minn. Stat. § 363A.16. In particular, Hunter alleged that Ericksen's authorization of Carpenter to engage in a "Mark-up Policy" had a disparate impact on her as a vulnerable African American female compared to other similarly-situated Caucasians, resulting in her being charged with more finance charges and a higher interest rate than similarly situated

Caucasians.  See Amended Complaint, ¶¶ 81-94, 123-127; November 12, 2009 Order

[Docket No. 144] at pp. 30-31.

The ECOA prohibits discrimination by a "creditor against any applicant for credit

on the basis of race, color, religion, national origin, sex or marital status, or age.  See 15

U.S.C. § 1691(a)(1).  ECOA defines a "creditor" as "any person who regularly extends,

renews, or continues credit; any person who regularly arranges for the extension,

renewal, or continuation of credit; or any assignee of an original creditor who

participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a(e).[9]

Minn. Stat. § 363A.16 provides:

> Personal or commercial credit. It is an unfair discriminatory
> practice to discriminate in the extension of personal or
> commercial credit to a person, or in the requirements for
> obtaining credit, because of race, color, creed, religion,
> disability, national origin, sex, sexual orientation, or marital
> status, or due to the receipt of federal, state, or local public
> assistance including medical assistance.[10]

---

[9]     The regulations promulgated under the Act provide in relevant part:

> Creditor means a person who, in the ordinary course of
> business, regularly participates in a credit decision, including
> setting the terms of the credit. The term creditor includes a
> creditor's assignee, transferee, or subrogee who so
> participates. For purposes of § 202.4(a) and (b), the term
> creditor also includes a person who, in the ordinary course of
> business, regularly refers applicants or prospective
> applicants to creditors, or selects or offers to select creditors
> to whom requests for credit may be made. A person is not a
> creditor regarding any violation of the Act or this regulation
> committed by another creditor unless the person knew or
> had reasonable notice of the act, policy, or practice that
> constituted the violation before becoming involved in the
> credit transaction.

12 C.F.R § 202.2(l) (emphasis added).

[10]     Minnesota courts have found that interpretations of the MHRA are guided by
federal cases interpreting federal discrimination statutes to the extent they contain
language that similar in many respects.  Cummings v. Koehnen, 568 N.W.2d 418, 423

A credit applicant may prove discrimination under the ECOA by using any one of the following approaches used in the employment context: "'1) direct evidence of discrimination; 2) disparate impact analysis, also called the 'effects' test; or 3) disparate treatment analysis.'" Palmer v. Homecomings Financial LLC, 677 F. Supp.2d 233, 241 (D.D.C. 2010) (quoting A.B. & S. Auto Serv., Inc. v. S. Shore Bank of Chicago, 962 F. Supp. 1056, 1060 (N.D. Ill. 1997)). In order to present a prima facie claim of disparate treatment, Hunter must prove, among other things, that "circumstances give rise to an inference of discrimination, as similarly situated [individuals], who are not members of the protected group, were treated differently." Jacob-Mua v. Veneman, 289 F.3d 517, 521-22 (8th Cir. 2002) (citations omitted). In other words, a disparate-treatment claim is proven by demonstrating that defendants treated Hunter "less favorably than others because of [her] race, color, religion, sex, or national origin." Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15 (1977). "To prove discrimination under a disparate-impact theory, a plaintiff "must identify . . . a facially-neutral [ ] practice [and] demonstrate a disparate impact upon the group to which he or she belongs.'" Brown v. Ameriprise Financial Services, Inc., Civ. No. 09-2413(RHK/FLN) --- F. Supp.2d ----, 2010 WL 1544173 at * 4 (D. Minn. April 16, 2010) (quoting Lewis v. Aerospace Cmty. Credit Union, 114 F.3d 745, 750 (8th Cir. 1997)). This is usually accomplished through the use of statistical evidence, which shows that the practice in question has a disparate impact based on a membership in a protected group. See Langlie v. Onan Corp., 192 F.3d 1137, 1140 (8th Cir. 1999) (citing Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994 (1988)).

n. 5 (Minn. 1997) (citation omitted). This Court finds that the ECOA and Minn. Stat. § 363A.16 contain sufficiently similar language that it is appropriate to apply federal cases analyzing the ECOA to its analysis of Hunter's claim under § 363A.16.

In support of her claims, including those asserted under the ECOA and the MHRA, Hunter referenced hundreds of exhibits in her Separate Statement of Undisputed Facts in Support of Motion for Summary Judgment [Docket No. 133], none of which she attached to her moving papers including: a 2004 expert report, in an unrelated legal action, regarding the racial impact of Ford's finance charge policy; 2004 and 2006 articles dealing with mark up of loans against minorities; an amicus brief in support of a petition for a writ of certiorari; a press release from members of Congress; and testimony to Congress from low income advocates.[11]

The Court concludes that all defendants are entitled to summary judgment on Hunter's claims of discrimination under ECOA and Minn. Stat. § 363A.16.

First, as to Ford, Hunter admitted that it had no involvement in financing of her vehicle.  <u>See</u> Hunter Dep. at p. 188.  That fact alone dictates that Ford cannot be held liable under ECOA or Minn. Stat. § 363A.16, as Hunter has not established that Ford had any connection to in the extension of credit to her, a clear prerequisite for any finding of liability under these statutes.

---

[11]     The Court notes that Hunter has filed exhibits in this case at various times.  <u>See</u> Docket Nos. 1, 36, 66, 75, 77, 107, 135, 145, 151.  As best as this Court can discern, the documents referenced by Hunter in support of her motion for summary judgment were attached to Hunter's Complaint [Docket No.1]; her Objection and Response to Notice of Motion to Dismiss by Chrysler [Docket No. 36]; the Declaration of Inez Hunter in Support of Objection with Attached Exhibits of Expert Witness Congress Woman Marcy Kaptur [Docket No. 66]; and Motion to Disqualify Judge Janie S. Mayeron [Docket No. 75].  Hunter has never explained how any of these exhibits, much less what portions of the exhibits, supported her claims.  It is not this Court's duty to search for factual support or disputes within these documents in support of her position.  <u>See</u> <u>Rodgers v. City of Des Moines</u>, 435 F.3d 904, 908 (8th Cir. 2006) ("Without some guidance, we will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments"); <u>see also</u> <u>Nw. Nat'l Ins. Co. v. Baltes</u>, 15 F.3d 660, 662-63 (7th Cir. 1994) (Easterbrook, J.) ("District judges are not archaeologists."); <u>United States v. Dunkel</u>, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs").

Second, as for CFA and the HAI defendants,[12] Thurman Rickerson, Senior Vice President in the Dealer Administrative Group for CFA, stated that on September 28, 2007, HAI submitted to CFA a financing application and CFA in turn relayed to HAI the financing terms it would accept based solely on the information contained in Hunter's financing application, Hunter's credit history and the amount she sought to finance, and without any influence by Hunter's age, sex, race or disability. See Declaration of Thurman Rickerson ("Rickerson Decl."), ¶ 3. Rickerson also stated that CFA had no involvement with the Ford Z-Plan, the decision to grant Hunter benefits or discounts under the plan, the provision of GAP insurance to Hunter or communications with Hunter regarding the insurance. Id., ¶¶ 6-8. Hunter submitted no evidence to contradict Rickerson's affidavit. In fact, during her deposition, Hunter testified she was "not sure" if she had any evidence that the interest rate she was charged was based on anything other than her financial condition and credit report. See Hunter Dep. at p. 158. While Hunter referred to a "secret agreement" between HAI and CFA to scheme against African American customer, she admitted, "I do not know what the secret agreement is. . . ." Id. at pp. 158-59.

Third, as to all defendants, Hunter has provided this Court with no direct evidence of discrimination or evidence to support a disparate-treatment or disparate-impact claim of discrimination based on her race, gender or disability with respect to the credit extended to her by CFA. Even to the extent that the exhibits referenced by Hunter in support of her motion for summary judgment were somehow properly

---

[12] The HAI defendants did not address Hunter's claims under ECOA or Minn. Stat. § 363A.16, except to say that they were incorporating and relying upon those arguments of the other defendants to the extent they were applicable to HAI. See Memorandum of Hastings Automotive, Inc., Dion Carpenter and Doug Ericksen in Support of Motion for Summary Judgment ("HAI Mem.") [Docket No. 180] at p. 1 n. 1.

authenticated (which they were not) or were not inadmissible hearsay (which they are), there is no evidence before the Court demonstrating that Ford, the HAI defendants or CFA treated Hunter less favorably than others based on her race, sex or disability, or that their specific practices had a disparate impact, evidenced by statistical data, upon the protected groups of which she was a member during the relevant time-period.

In summary, to make out a claim under the ECOA or Minn. Stat. § 363A.16, it is not enough for Hunter to show that she is a female, African American or disabled[13] and that she received unfavorable financing when she purchased her car. Having presented no admissible evidence to counter the evidence submitted by the defendants, it is recommended that their motions for summary judgment be granted as they related to Hunter's ECOA and Minn. Stat. § 363A.16 claims, and Hunter's Motion for Summary Judgment, as it bore on these claims, be denied.

**B.  Civil Rights Act Claims: Racial Discrimination 42 U.S.C. § 1981, § 1982, et seq. and Human Rights Act Chapter 363a et seq.**

Hunter argued that defendants did not run the figures for a new vehicle, totally disregarded the control numbers for the Z-Plan Program that she gave them and she was coerced into purchasing a used vehicle. As Hunter stated at the hearing:

> I am saying that they discriminated against me because I am female, of the black race, and they did discriminate against me because of my disability. They had the papers in their hand. They also had the control numbers. If it was a Caucasian person going into a dealership, they would have done everything they could have to make sure that that person got the new vehicle that they came to purchase.

Hunter's Oral Argument at March 17, 2010 Hearing, at 8:32-9:08.

---

[13]     The only evidence in the record that this Court can discern regarding Hunter's disability is that she showed HAI's employee, Walker, evidence of her income in the form of her social security disability statement and her retirement trust fund papers. See Hunter Dep. at pp. 81-82.

In support of their motions, the HAI defendants and CFA maintained that Hunter produced no evidence that she was entitled to any of the entitlements of the Ford Z-Plan program or that they were required to search the inventories of other dealerships to find her a new vehicle, and that Hunter failed to provide any evidence that she was discriminated against by them in any manner. <u>See</u> HAI Mem. at p. 9; Citi Financial Auto and Tony Feell's Motion for Summary Judgment ("CFA Mem.") [Docket No. 158] at p. 8. Ford argued that it had no contact with Hunter prior to her purchase of the used Taurus and consequently, could not be liable for the actions of HAI because HAI is an independent automobile dealer and was not an agent of Ford. <u>See</u> Ford Motor Company's Motion for Summary Judgment ("Ford Mem.") [Docket No. 173] at pp. 2-3.

Section 1981, in part, addresses racial discrimination in contracts. Specifically, it provides for equal rights under the law and states that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a). "Any claim brought under § 1981, therefore, must initially identify an impaired 'contractual relationship,' § 1981(b), under which the plaintiff has rights," which was the result of racial discrimination. <u>See</u> <u>Domino's Pizza, Inc. v. McDonald</u>, 546 U.S. 470, 476 (2006). "A plaintiff establishes a prima facie case under § 1981 by showing (1) membership in a protected class; (2) the intent to discriminate on the basis of race on the part of the defendant; and (3) discrimination interfering with a protected activity (i.e., the making and enforcement of contracts)." <u>Daniels v. Dillard's, Inc.</u>, 373 F.3d 885, 887

(8th Cir. 2004) (citing <u>Bediako v. Stein Mart, Inc.</u>, 354 F.3d 835, 839 (8th Cir. 2004));

<u>see</u> <u>also</u> <u>Smith v. DataCard Corp.</u>, 9 F. Supp.2d 1067, 1078 (D. Minn. 1998) ("To

recover damages under section 1981, a plaintiff must establish that: (1) the plaintiff is a

member of a racial minority; (2) defendant intended to discriminate on the basis of race;

and (3) the discrimination concerned one or more of the activities enumerated in the

statute, e.g., to make and enforce contracts.").[14]

Section 1982 states that "[a]ll citizens of the United States shall have the same

right, in every State and Territory, as is enjoyed by white citizens thereof to inherit,

purchase, lease, sell, hold, and convey real and personal property." The elements of a

§ 1982 claim, which are parallel to those of a § 1981 claim, are: (1) membership in a

protected class; (2) discriminatory intent on the part of the defendant; and (3)

interference with the rights or benefits connected with the ownership of property.

<u>Daniels</u>, 373 F.3d at 887 (citation omitted).

---

[14]     Hunter also relied on Minn. Stat. § 363A.17 as to all defendants, which provides
in relevant part:

> It is an unfair discriminatory practice for a person engaged in
> a trade or business or in the provision of a service:
>
> * * *
>
> (3) to intentionally refuse to do business with, to refuse to
> contract with, or to discriminate in the basic terms,
> conditions, or performance of the contract because of a
> person's race, national origin, color, sex, sexual orientation,
> or disability, unless the alleged refusal or discrimination is
> because of a legitimate business purpose.

A claim under Minn. Stat. § 363A.17 uses the same analytical framework as a
Section 1981 racial discrimination claim. <u>See</u> <u>Saulsberry v. St. Mary's Univ.</u>, 318 F.3d
862, 866 (8th Cir. 2003) ("The elements of a MHRA . . . and § 1981 discrimination
claims are the same."); <u>Boone v. PCL Const. Services, Inc.</u>, Civ. No. 05-24(MJD/JGL),
2005 WL 1843354 at *2-*4 (D. Minn. August 02, 2005) (citing <u>Smith</u>, 9 F. Supp.2d at
1078).

Section 1981 claims are examined under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Sandy Hill Apartments v. Kudawoo, Civ. No. 05-2327(PAM/JSM), 2006 WL 2974305 at *2 (D. Minn. Oct. 16, 2006) (citing Maxfield v. Cintas Corp. No. 2, 427 F.3d 544, 550 (8th Cir. 2005)). "Under this framework, [a plaintiff] must first establish a prima facie case. Specifically, she must present evidence that she was in a protected class and that she was treated differently than similarly situated non-members of the class." Id. (citing Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth., 299 F. Supp.2d 952, 958 (E.D. Mo. 2004), aff'd, 417 F.3d 898 (8th Cir. 2005)). Section 1981 "reaches only purposeful discrimination" and does not cover practices that merely result in a disproportionate impact on particular class. See General Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 386-89 (1982).

Section 1982 claims follow a similar analysis to claims under § 1981, including that it only reaches intentional discrimination. See Tillman v. Wheaton-Haven Recreation Ass'n, Inc., 410 U.S. 431, 440 (1973) ("In light of the historical interrelationship between § 1981 and § 1982, we see no reason to construe these sections differently when applied, on these facts, to the claim of Wheaton-Haven that it is a private club. Consequently, our discussion and rejection of Wheaton-Haven's claim that it is exempt from § 1982 disposes of the argument that Wheaton-Haven is exempt from § 1981."); see also Daniels, 373 F.3d at 887; Jiang v. Allstate Ins. Co., 199 F.R.D. 267, 271 (N.D. Ill. 2001) ("a case for disparate impact discrimination under sections 1981 and 1982 will not lie.").

The crux of Hunter's clams under §§ 1981 and 1982 and Minn. Stat. § 363A.17 is that defendants kept her from enjoying the benefit of purchasing a new vehicle under

the Z-Plan, which according to her, would have allowed her to purchase a new vehicle at a lower price.

Based on the undisputed record before this Court, all defendants should be granted summary judgment on Hunter's clams under §§ 1981 and 1982 and Minn. Stat. § 363A.17.

For starters, there is no evidence in the record that when Hunter went to HAI to buy a car, she was entitled to the benefits of the Z-Plan Program or what the benefits of the Z-Plan Program entailed. What the evidence does show is:

- Hunter received a discount when she purchased her 1997 Thunderbird. See Hunter Dep. at pp. 112-13.

- Anthony Siad, Ford's Dealer Contract Supervisor, stated in his Affidavit that the Z-Plan pricing is reserved for Ford retirees and their surviving spouse. See Affidavit of Anthony Said ("Said Aff."), ¶ 26. Hunter does not fall in either of these categories.

- Hunter had never seen a copy of the Z-Plan policy and she did not have any evidence to support her claim that she was entitled to the plan benefits as the daughter of a deceased employee. See Hunter Dep. at pp. 182-83.

- On September 28, 2007, Hunter went to the HAI dealership to purchase a vehicle with control numbers written given to her by her sister stemming from their father's prior employment with Ford. Hunter's sister had called Ford claiming that she was the daughter of a Ford employee and that she wanted to buy a car under the program. Id. at pp. 83-85;[15] see also Second Hunter Aff., ¶¶ 3, 4.

While Hunter may have shown Z-Plan numbers given to her by her sister to HAI employees, this does not provide proof as to her entitlement to the benefits under the Z-Plan. Similarly, even if she purchased a new Ford Thunderbird in 1997 under the plan,

---

[15] To the extent that Hunter is claiming that her sister told Hunter that Hunter was entitled to the Z-Plan benefits based on telephone calls Hunter's sister made to someone at Ford, this testimony is inadmissible double-hearsay.

this does not mean she was entitled to the benefits of the Z-Plan Program in September of 2007. Failure to provide any admissible evidence demonstrating that she was entitled to benefits under the Z-Plan program, much less the nature of those benefits, is fatal to Hunter's claims under §§ 1981 and 1982 and Minn. Stat. § 363A.17. In short, Hunter has not shown that defendants interfered with a prospective contract under the Z-Plan program or that defendants interfered with her ability to buy property in the form of a new vehicle under the program.

Defendants are also entitled to summary judgment on Hunter's claims under §§ 1981 and 1982 and Minn. Stat. § 363A.17 because Hunter has failed to submit any evidence that defendants intentionally discriminated against her based on her race – i.e., treated her any differently from Caucasian customers. Hunter's belief that she was the subject of discrimination based on race and disability is not evidence of intentional discrimination on the part of defendants.

For all of these reasons, this Court finds that defendants' motions for summary judgment on Hunter's claims under §§ 1981 and 1982 and Minn. Stat. § 363A.17 should be granted and Hunter's motion for summary judgment on these claims should be denied.

**C.** **Claims Under Minnesota Uniform Deceptive Trade Practice Act (Minn. Stat. §§ 325D.43 to 325D.48); and the Minnesota False Statements in Advertising Act (Minn. Stat. § 325F.67)**

Hunter asserted that defendants engaged in deceptive trade practices by misleading her into believing that she was buying merchandise at prices substantially lower than Z-Plan pricing, when she was not; misleading her as to the quality of the merchandise purchased; and depriving her of various customer services. See Amended Complaint, ¶ 124. According to Hunter, these actions violated the application

provisions of the Minnesota Uniform Deceptive Trade Practice Act under Minn. Stat. §§ 325D.43 to 325D.48; the Minnesota False Statements in Advertising Act under Minn. Stat. § 325F.67. These claims have already been dismissed with prejudice as to Ford. See July 21, 2009 Order [Docket No. 112]. The Court will proceed with it analysis of these claims against CFA and the HAI defendants.

This Court finds that Hunter's Minnesota Uniform Deceptive Trade Practice Act ("DTPA") claim against CFA and the HAI defendants under Minn. Stat. §§ 325D.43 to 325D.48 fails as a matter of law because she does not have standing to assert a claim under the DTPA. The DTPA does not afford for a private cause of action for monetary damages. See Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc., 603 N.W.2d 336, 339-40 (Minn. Ct. App. 1999) (finding that the DTPA provides only injunctive relief and does not afford a private cause of action for monetary damages); see also i-Systems, Inc. v. Softwares, Inc., Civ. No. 02-1951 (JRT/FLN), 2004 WL 742082 at *15 (D. Minn. March 29, 2004) (concluding that the DTPA "permits a plaintiff to seek injunctive relief, but not monetary damages.") (citation omitted). Although Hunter requested injunctive relief in her Amended Complaint in the form of requiring defendants to award her a contract to appoint a third party to update Ford and HAI's computer systems to keep track of individuals who are eligible under the Z-Plan Program and awarding her a contract to appoint a third party to update CFA's computer systems to keep track of comparable rates and those rates provided to minorities, Hunter has provided this Court with no evidence that she is at risk of any future harm from defendants -- i.e., that she will be a purchasing a vehicle from Ford or HAI or that she will be seeking financing from CFA. Injunctive relief is therefore not available because Hunter is not likely to be damaged by any further alleged deceptive trade practices by defendants. See Reno v.

Supportkids, Inc., No. Civ. 01-2331(JNE/JSM), 2004 WL 828150 at *4 (D. Minn. April 13, 2004) (citing Minn. Stat. § 325D.45, subd. 1) (citation omitted); see also Gardner v. First American Title Ins. Co., 296 F. Supp.2d 1011, 1020 (D. Minn. 2003) (quoting Lofquist v. Whitaker Buick-Jeep-Eagle, Inc., 2001 WL 1530907 at *2 (Minn. Ct. App. Dec. 4, 2001)) ("'Because the MDTPA provides [injunctive] relief for a 'person likely to be damaged,' it provides relief from future damage, not past damage.' Here, the evidence before the Court does not indicate a likelihood of future harm. Although Plaintiffs try to fill this evidentiary gap with argument, this case is now at summary judgment and Plaintiffs must advance record evidence sufficient to support an inference of future harm to Plaintiffs."); Jets Prolink Cargo, Inc. v. Brenny Transp., Inc., Civ. No. 02-1294 (ADM/RLE), 2003 WL 22047910 at *4 (D. Minn. Aug. 29, 2003) (finding that as to a claim under the Minnesota Deceptive Trade Practices Act, there were "no material facts at issue regarding the risk of future harm in this case pertaining to M & M. Accordingly, injunctive relief is inappropriate.").

Likewise, Hunter lacks standing to pursue a claim against CFA and the HAI defendants under the Minnesota False Statements in Advertising Act ("MFSAA"), Minn. Stat. § 325F.67. "The MFSAA prohibits a corporation from disseminating any advertisement that 'contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading' in connection with the sale of merchandise or services." Bykov v. Radisson Hotels Intern., Inc., Civ. No. 05-1280 (ADM/JSM), 2006 WL 752942 at *4 (D. Minn. March 22, 2006) (quoting Minn. Stat. § 325F.67). However, like the CFA, claims under the MFSAA "are typically enforced by the state attorney general." Id. (citing Minn. Stat. §§ 325F.67; 325F.70, subd. 1). Given that Hunter did not bring her MFSAA claims through the Minnesota Private Attorney General Statute,

and she cannot pursue her claims via this statute, as the alleged misrepresentations were only made to her and her claim does not benefit the public, her MFSAA claim cannot proceed. In any event, the only advertisement that this Court can discern from the record is the flier in the mail from HAI advertising an offer to trade in her vehicle for the price of $2,500. See Hunter Dep. at pp. 74-75. Hunter has admitted that she received the $2,500 credit for the trade-in of her vehicle and the Installment Contract confirms that she was credited $2,500 for her trade-in. Id. at p. 132, Ex. 4 (Installment Contract). This leaves no dispute of fact regarding whether she received the trade-in credit as advertised.

For all of the reasons stated above, defendants' motions for summary judgment should be granted and Hunter's motion for summary judgment should be denied as it relates to her claims under Minn. Stat. §§ 325D.43 to 325D.48 and 325F.67.

### D. Claims of Fraud: Minn. Stat. §§ 325D.09 and 325F.71.

Hunter has alleged a myriad of deceptive trade practices on the part of defendants in violation of Minn. Stat. §§ 325D.09 and 325F.71. As stated previously, the false and misleading conduct and statements that are still at issue, as part of Hunter's Amended Complaint include:

- Carpenter made a false and misleading statements that she could refinance her vehicle in six months and receive a lower interest rate. See November 12, 2009 Order at p. 36 (citing proposed amended complaint ¶¶ 67, 130(1), (4), (7)).

- "Carpenter lied to and told her that that she could not afford a new vehicle." Id. at pp. 34, 36 (citing proposed amended complaint ¶ 129).

- HAI employees Carpenter and Ericksen, Ford CEO Mulally and CFA employee Feell fraudulently proclaimed and concealed available Ford Taurus inventory (specifically that that neither Ford nor its authorized dealerships had any new Ford Taurus vehicles in stock), in order to obstruct Hunter from entering into a contractual relationship under the Ford Z Plan and at the same time gave her unfavorable terms under a loan packing scheme. Id. at p. 33 (citing proposed

amended complaint ¶¶ 123, 128 (in conjunction with ¶¶ 47, 48, 50, 51, 60, 61, 62, 64-68, 96, 100, 130(2)).

- Carpenter and Ericksen concealed the terms of the "Loan Packing GAP Insurance Scam" imbedded with a 22.25% interest rate. Id. at pp. 35, 36 (citing proposed amended complaint ¶ 130(3) (in conjunction with ¶¶ 53, 85)).

- Defendant Carpenter scammed her as it relates to the value of her 2003 Ford Taurus, by increasing the cost of her vehicle over its value. Id. at p. 36 (citing proposed amended complaint ¶ 62).[16]

### 1. Claims Against Ford

Ford argued that it could not be held liable for the deceptive acts alleged to have occurred at HAI on September 28, 2007, as Hunter has admitted that Ford was a complete stranger to the transaction between her and HAI. See Ford Mem. at p. 9. Hunter testified at her deposition that the first time she spoke with any employee or agent of Ford was after the purchase of the Ford Taurus on September 28, 2007 and that Ford did nothing wrong with regards to the purchase of her vehicle. See Hunter Dep. at pp. 185, 194. As such, there is no evidence to suggest that Ford or its CEO Mulally had any involvement with the alleged deceptive trade practices surrounding the sale and financing of the vehicle on September 28, 2007.

In addition, Ford contended that while Hunter asserted that Ford should be held liable for deceptive acts perpetrated by HAI on the basis that HAI was an agent of Ford, the only proof offered by Hunter for an agency relationship was the Ford sign outside of the dealership and that HAI sold Ford Vehicles. See Ford Mem. at pp. 9-10.

---

[16] As it pertains to Hunter's assertions at the hearing that defendants mislead her on the 30-day warranty they had provided to her with the car, these claims are not part of her Amended Complaint. See November 12, 2010 Order [Docket No. 144] at p. 34 (rejecting allegations in the proposed amended complaint that defendants had mislead her as to the quality of the car she was buying (by lying to her that it had a 30-day warranty, when in fact it did not), as these allegations were not plead with sufficient particularity for the purposes of Rule 9(b) of the Federal Rules of Civil Procedure).

Pursuant to Minnesota law, "[a]gency is the fiduciary relationship that results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." A. Gay Jenson Farms Co. v. Cargill, Inc., 309 N.W.2d 285, 290 (Minn. 1981) (citations omitted). "When the circumstances involve a party who sells another party's product, factors to be considered in making this determination include whether the alleged agent acquires absolute ownership and title of the goods before selling them to a third party, and whether the alleged principal has control over where the alleged agent can sell the goods, to whom she can sell them, and for what price." Minnesota Forest Products, Inc. v. Ligna Machinery, Inc., 17 F. Supp.2d 892, 913-14 (D. Minn. 1998) (citing Louis DeGidio Oil & Gas Burner Sales and Serv., Inc. v. Ace Eng'g Co., Inc., 302 Minn. 19, 25, 225 N.W.2d 217, 221-22 (1974)).

Here, the undisputed facts are that HAI was an independent motor vehicle dealer authorized to service and sell Ford vehicles pursuant to the March 2, 2006 Ford Sales and Service Agreement ("FSSA"). See Said Aff., ¶ 3, Ex. 1 (FSSA). The FSSA provided that the "agreement does not create the relationship of principal and agent between" Ford and HAI and that "under no circumstances" was HAI to be considered and agent of Ford. Id., Ex. 1 (FSSA), § 14. The FSSA further stated :

> This agreement contemplates that all vestments by or in the Dealer shall be made, and the Dealer shall purchase and resell COMPANY PRODUCTS, in conformity with the provisions hereof, but otherwise in the discretion of the Dealer and the Dealer's owners.

Id., Ex. 1 (FSSA), § 29. The FSSA did require a dealer to maintain stocks of new vehicles, provide purchasers with a vehicle manual, requires a dealer to render prompt and courteous service, maintain facilities and signs that are in satisfactory appearance,

and employ and train competent personnel of good character.  Id., Ex. 1 (FSSA), §§ 2, 4, 5, 6).  On the other hand, there was no requirement in the FSSA that indicated that Ford has control over the day-to-day operations of dealers, including employment decisions.  Id., ¶¶ 9, 23-24.  The FSSA specifically stated that, "[t]itle to each COMPANY PRODUCT purchased by a Dealer shall . . . pass to the Dealer. . . ."  Id., Ex. 1 (FSSA), § 11(b).  Further, there was no requirement as to the price HAI could sell a vehicle to consumers, and Ford did not control the financing of customer-purchased vehicles at HAI.  Id., ¶¶ 12, 18.  Ford did not own any stock in HAI and did not share in the profits or losses of HAI.  Id., ¶ 5.

Hunter's grounds for asserting liability against Ford under an agency theory was the presence of a Ford sign at the HAI dealership, that HAI sold Ford vehicles, and the requirements for dealers set forth under the FSSA.  See Hunter Dep. at pp. 195-96; see also Objection to Ford Motion for Summary Judgment and Memorandum of Law [Docket No. 185] at pp. 6-7.  However, the undisputed evidence in the record establishes that Ford did not have any title to the vehicles purchased by HAI, had no control over the buyers to whom HAI could sell vehicles, or the price it could charge.  On these facts, Ford cannot be held liable for the fraudulent or discriminatory acts of HAI under an agency theory.

Having concluded that HAI was not Ford's agent, Ford's motion for summary judgment should be granted and Hunter's motion for summary judgment should be denied, insofar as Hunter seeks to hold Ford liable for HAI's alleged misconduct.

## 2. Claims Against CFA and Feell

As to CFA and Tony Feell, Hunter testified that she did not speak with or have any contact with anyone from CFA prior to the purchase of her vehicle on September 28, 2007, and specifically provided:

> Q: Okay. So ma'am, in your Complaint that you filed, you allege that a number of false and misleading and deceptive statements were made to you on the day that you purchased your vehicle. Is that correct?
>
> A: That's correct.
>
> Q: But because you had no conversation with at all on the day of this purchase, none of those statements could have been made by anyone at CitiFinancial Auto. Isn't that correct.
>
> A. That's correct.

See Hunter Dep. at pp. 174-75. Hunter also acknowledged that she was not claiming that there was an agency relationship between HAI and CFA; instead she was only asserting that there was an unknown "secret agreement" between them as it related to financing. Id. at pp. 202-03.

This Court finds that CFA and Feell are entitled to summary judgment on Hunter's fraud claims against them pursuant to Minn. Stat. §§ 325D.09 and 325F.71 where Hunter admitted that they did not engage in such activity as part of the sale of the vehicle, directly, or under an agency theory. With regards to the purported "secret agreement," the Court addresses that issue below.

The Court now turns to the claims of fraudulent activity alleged against the HAI defendants.

### 3. Claims Against the HAI Defendants that Hunter Could Refinance Her Vehicle After Six Months

Hunter asserted that Carpenter made a false and misleading statement that she could refinance her vehicle in six months and receive a lower interest rate than the 22.25% she was being charged, although he did not promise any specific rate of interest.[17]  See Hunter Dep. at p. 118-19.  Under Minnesota law, "'[i]t is a well-settled rule that a representation or expectation as to future acts is not a sufficient basis to support an action for fraud merely because the represented act or event did not take place.'"  Valspar Refinish, Inc. v. Gaylord's, Inc., 764 N.W.2d 359, 368-69 (Minn. 2009) (quoting Vandeputte v. Soderholm, 298 Minn. 505, 216 N.W.2d 144, 147 (1974)).  "Where a representation regarding a future event is alleged, . . . an additional element of proof is that the party making the representation had no intention of performing when the promise was made."  Martens v. Minn. Mining & Mfg. Co., 616 N.W.2d 732, 747 (Minn. 2000) (citation omitted).  Another "essential element in an action for fraud is that the fact misrepresented must be 'susceptible of knowledge."  Control Data Corp. v. Garrison, 305 Minn. 347, 350, 233 N.W.2d 740, 742 (Minn. 1975) (string citations omitted).  In other words the facts represented by the speaker must be "clearly ascertainable."  Id. at 353, 744.

Even if Carpenter made the representations at issue, these representations are for a future event and Hunter has presented no evidence that Carpenter had no intention of performing what he allegedly stated when the representations were made.  Further, whether Hunter could refinance her vehicle in six months is not a fact that is readily susceptible of knowledge because there are many factors that go into a decision

---

[17]  This Court notes that to the extent that Hunter was alleging that "Defendants made false and misleading assertions that the rate [of 22.25%] was the 'best they could get'" (Amended Complaint, ¶ 62), Hunter provided no evidence to support this assertion.

on financing. For example, neither Hunter nor the HAI defendants could have known what her income level or credit level would have been six months later or the condition of her vehicle at the time of the re-financing. See Hunter Dep. at pp. 119-20; see generally, Rickerson Decl., ¶ 3 (noting that a decision on financing is based on information provided by an applicant, their credit history and the amount to be financed).

Carpenter's alleged false and misleading statement that Hunter could refinance her vehicle in six months and receive a lower interest rate than the 22.25% does not amount to actionable fraud. Therefore, this Court finds that summary judgment is appropriate as to Hunter's claims against the HAI defendants under Minn. Stat. §§ 325D.09 and 325F.71, as it relates the claimed representation on refinancing.

### 4. Claims Against the HAI Defendants that Hunter Could Not Afford a New Vehicle

Hunter's allegation that Carpenter made a false statement to her that she could not afford a brand new car is not actionable. "A fraud claim cannot be based on predictions, opinions, or sales puffery." Liimatta v. V & H Truck, Inc., Civ. No. 03-5112 (JNE/RLE), 2005 WL 2105497 at *4 (D. Minn. Aug. 30, 2005) (citing Dollar Travel Agency, Inc. v. Northwest Airlines, Inc., 354 N.W.2d 880, 883 (Minn. Ct. App. 1984)); see also Minnesota Forest Products, Inc. v. Ligna Machinery, Inc., 17 F. Supp.2d 892, 909 (D. Minn. 1998) ("In addition, fraudulent statements must be more than statements of opinion or puffing.") (citing Hollerman v. F.H. Peavey & Co., 269 Minn. 221, 228-29, 130 N.W.2d 534, 540 (1964)). Hunter's only assertion in the record is that Flann, and not Carpenter, told her that she could not afford the payments. See Hunter Dep. at pp. 100-101. At best, the statement that Hunter could not afford a new vehicle was based Flann's opinion based on looking at her social security and financial paperwork. As such, Hunter claim of fraud cannot be predicated on this statement.

**5.     Claims Against the HAI Defendants Regarding Their Failure to Look for New Fords at Other Dealerships**

Hunter's assertion that Carpenter and Ericksen fraudulently proclaimed and concealed available Ford Taurus inventory (specifically that that neither Ford nor its authorized dealerships had any new Ford Taurus vehicles in stock), in order to obstruct Hunter from entering into a contractual relationship under the Ford Z-Plan is not an actionable omission. "A misrepresentation may be made either (1) by an affirmative statement that is itself false or (2) by concealing or not disclosing certain facts that render the facts that are disclosed misleading." M.H. v. Caritas Family Servs., 488 N.W.2d 282, 289 (Minn. 1992). Hunter did not assert that defendants represented that other dealerships did not have new Fords. Instead, it was her contention that defendants were required under the Z-Plan program to search other dealerships for new vehicles. See Hunter Dep. at p. 117; see also Second Hunter Aff., ¶ 5. The failure to meet an obligation under an alleged policy or contract does not lead to the conclusion that there was a per se unfair or fraudulent trade practice. In any event, Hunter has offered no evidence showing that the Ford Z-Plan required the HAI defendants to search other dealerships for new vehicles. Further, there is no assertion or evidence of an affirmative statement by the HAI defendants regarding the availability of new Fords at other dealerships on September 28, 2007.

Finally, even to the extent that Hunter was asserting that the HAI defendants' failure to tell her about any new Fords amounted to a fraudulent nondisclosure, this Court finds that there was no obligation for these defendants to disclose such information to Hunter. Applying Minnesota law, the Eighth Circuit has concluded that:

> For a nondisclosure to amount to a fraud, a party must first be under a duty to disclose information to another party. Richfield Bank & Trust Co. v. Sjogren, 309 Minn. 362, 244

N.W.2d 648, 650 (1976). Under Minnesota law, such a duty can arise in one of the following three circumstances: (1) where a party has made a representation and must disclose more information to prevent the representation from being misleading; (2) where a party has special knowledge of material facts to which the other party does not have access; and (3) where a party stands in a confidential or fiduciary relation to the other party. Id. Once such a duty is established, concealment is fraudulent if: "a party conceals a fact material to the transaction, and peculiarly within his knowledge, knowing that the other party acts on the presumption that no such fact exists. . . ."

Exeter Bancorporation, Inc. v. Kemper Securities Group, Inc., 58 F.3d 1306, 1314 (8th Cir. 1995) (quoting Thomas v. Murphy, 87 Minn. 358, 91 N.W. 1097, 1098 (1902)).

Here, there is no evidence or even an assertion by Hunter that the HAI defendants made any representation regarding the availability of new Ford vehicles at dealerships outside of HAI. Similarly, there are no facts in the record that the HAI defendants had any more information in their possession regarding the availability of new Fords at other dealerships than Hunter had on September 28, 2007. For example, while Hunter referenced an advertisement showing a new 2007 Ford Taurus at a White Bear Ford Lincoln Mercury during her deposition (see Hunter Dep. at pp 115-17), there is nothing in the record that the HAI defendants were cognizant of the availability of this car on September 28, 2007. In addition, there is no evidence or assertion of a fiduciary relationship between Hunter and the HAI defendants, so as to require them to disclosure the availability of new vehicles at dealerships outside of the HAI. See Vacinek v. First Nat. Bank of Pine City, 416 N.W.2d 795, 800 (Minn. Ct. App. 1987) (noting that a customer relationship alone is not enough to establish a fiduciary relationship) (citing Klein v. First Edina National Bank, 293 Minn. 418, 422, 196 N.W.2d 619, 623 (1972)).

The HAI defendants' failure to disclose the available Ford Taurus inventory at dealerships other than HAI does not amount to a fraudulent nondisclosure. This Court finds that summary judgment is appropriate as to Hunter's claims under Minn. Stat. §§ 325D.09 and 325F.71 against the HAI defendants, as they relate to the claimed failure to disclose.

6. **Claims Against the HAI Defendants Regarding Concealment of the Terms of the Loan and the "Loan Packing GAP Insurance Scam"**

Hunter's assertion that Carpenter and Ericksen concealed the terms of the "Loan Packing GAP Insurance Scam" imbedded with a 22.25% interest rate is not supported by evidence. The Installment Contract set forth the annual percentage rate of 22.25%. See Hunter Deposition, Ex. 4 (Installment Contract) at p. 1. The Installment Contract also listed the $599 for GAP policy from Action Safe Drivers. Id. at p. 2. The Installment Contract instructed the signer not to sign the document unless she had read the agreement first, and Hunter's signature is on the document below this instruction. Id. Hunter also testified that Carpenter went over the "figures" of the Installment Contract with her and that she signed the Installment Contract. Id. at p. 109. Given that the 22.25% interest rate and GAP policy were set out in the Installment Contract, her signature verified that she read the Installment Contract, and Hunter admitted that Carpenter went over the figures of the Installment Contract with her before she signed it, the undisputed record establishes that these terms were not concealed.

To the extent that Hunter is claiming that Carpenter's insistence that she purchase GAP insurance amounted to an unfair trade practice or fraudulent activity when she already had such coverage by virtue of her automotive policy with Progressive Insurance, this claim also fails. See Objection to Hasting Automotive Inc.,

Dion Carpenter and Douge [sic] Ericksen Motion for Summary Judgment [Docket No 186] at pp. 3-4; Hunter's Oral Argument at March 17, 2010 Hearing, at 8:32-9:08.

Hunter's insurance policies with Progressive Insurance defined "LOAN/LEASE PAYOFF COVERAGE" as follows:

> If **you** pay a premium for Loan/Lease Payoff Coverage for a **covered vehicle**, and the **covered vehicle** sustains a **total loss**, **we** will pay, in addition to any other amounts otherwise payable under this Part IV, the difference between:
>
> 1.      the actual cash value of the **covered vehicle** at the time of the **total loss** reduced by the applicable deductible, and by its salvage value if **you** retain the salvage; and
>
> 2.      any greater amount the **owner** of the covered vehicle is legally obligate to pay under a written loan or lease agreement to which the **covered vehicle** is subject at the time of the **total loss**. . . .

See Second Declaration of Mark Scholle [Docket No 199], Ex. 2.[18]      Hunter characterized the purpose of the GAP insurance policy as paying off the loan of a vehicle to the extent that the vehicle was totaled in an accident. See Hunter Dep. at pp. 134-35.  The coverage summary for Hunter under the Progressive policy showed that she had selected the "Loan/Lease Payoff" coverage, effective August 6, 2003, for her 1997 Ford Thunderbird. See Second Declaration of Mark Scholle, Ex. 3.  However, the insurance policy in place on September 28, 2007, as it related to her 1997 Ford Thunderbird, did not contain "Loan/Lease Payoff" coverage. Id., Ex. 4 (Coverage Summary; Policy Period August 10, 2007-Feburary 10, 2008).  Nor did her policy contain such coverage when she added her 2003 Ford Taurus to the policy. Id., Ex. 4

---

[18]      The other policies from Progressive Insurance for Hunter provided similar definitions for "LOAN/LEASE PAYOFF COVERAGE."

(Coverage Summary/Policy Changes; Policy Period August 10, 2007-Feburary 10, 2008).

The undisputed material facts before the Court are that Carpenter did not force to Hunter to purchase an insurance policy she already possessed, where she did not have loan payoff coverage when she purchased the 2003 Ford Taurus. Therefore, any claim of fraud or unfair trade practices based on her purchase of the GAP policy cannot survive the HAI defendants' motion for summary judgment.

### 7. Claims Against the HAI Defendants of Fraud Concerning the Kelley Blue Book Value of the 2003 Ford Taurus

As it relates to Hunter's allegation that defendants "scammed" her regarding the value of her 2003 Ford Taurus by increasing the cost of her vehicle over its blue book value (see Amended Complaint, ¶¶ 59, 62), the Court notes that there is no allegation that defendants made any representation to Hunter as to the value of the car she was purchasing. Hunter did attach to her Affidavit the Kelley Blue Book values for various Ford Tauruses, which in many cases were priced lower that Hunter's Taurus. See Third Hunter Aff. at pp. 22-26 of 66 (Exs. 475-479). However, her Affidavit did not identify or list, let alone authenticate, these documents and therefore, they are not admissible due to Hunter's failure to authenticate. See Stuart v. Gen'l Motors Corp., 217 F.3d 621, 636 n. 20 (8th Cir. 2000) ("To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed.R. Civ. P. 56(e)."). Furthermore, these documents appear to be internet printouts for the Kelley Blue Book from sometime in 2010, which list Ford Tauruses for production years of 2007, 2005, and 2003, with varying mileages ranging from 29,020 miles to 136,044 miles, and a 2009 newspaper advertisement for a used

2003 Ford Taurus. <u>Id.</u> at pp. 19-20 of 66 (Ex. 320). What these printouts and newspaper classified advertisements lack is any mention as to the Kelley Blue Book value for Hunter's 2003 Ford Taurus in September of 2007. Given that there is no competent evidence before the Court regarding the Kelley Blue Book value for a 2003 Ford Taurus in September of 2007, with the comparable mileage of and condition to Hunter's vehicle, the Court finds that summary judgment is appropriate as to any claim that the HAI defendants "scammed" her on the Kelley Blue Book value of her 2003 Ford Taurus.

> **8. Claims Against the HAI Defendants Regarding False Representations as to the Trade-in-Credit of $2,500 Towards the Purchase of a Vehicle**

Hunter's claim that the HAI defendants made false representations to her that they would accept her Ford Thunderbird as a trade-in for $2,500 is meritless. The undisputed facts in the record, in the form of Hunter's own deposition testimony admitting that she received the $2,500 credit for her vehicle and express language of the Installment Contract stating that she had been credited the amount of $2,500 for her trade-in, establish that she received the trade-in credit as promised. <u>See</u> Hunter Deposition at p. 132, Ex. 4 (Installment Contract). Summary Judgment should be granted to the HAI defendants on any claim regarding the trade-in credit of $2500.

> **9. Discovery Issues**

Hunter asserted in her reply memoranda in support of her motion for summary judgment against defendants, that HAI had refused to provide her with documents sought by her interrogatories or provide any discovery; she was entitled to summary judgment on the basis that Ford and HAI withheld documents reflecting that she had purchased her Ford Thunderbird under the Z-Plan; and HAI and CFA had refused to

provide her with the "secret agreement" between them.  <u>See</u> Objection to Ford Opposition to Plaintiff's Motion for Summary Judgment [Docket No. 194] at p. 2-3; <u>see also</u> Objection to CitiFinancial Auto ("CFA"), Tony Feell Motion for Summary judgment [Docket No. 168] at p. 6.

To the extent that Hunter is claiming that summary judgment should not be entered on behalf of defendants based on a lack of needed discovery, she has not provided the necessary affidavit under Rule 56(f) of the Federal Rules of Civil Procedure.[19]  On the other hand, if Hunter is suggesting that summary judgment should be granted to her because defendants did not respond to her discovery, not only did Hunter fail to bring any motion to compel discovery before the February 15, 2010 deadline for non-dispositive motions passed (<u>see</u> Pre-trial Scheduling Order [Docket No. 99]), but Hunter never provided this Court with any reason as to why she failed to bring a timely motion to compel, to the extent she believed that defendants had withheld relevant discovery.  Most importantly, however, Hunter's complaint about lack of responses from defendants to her discovery, is at odds with her own conduct.  Hunter brought her own motion for summary judgment on October 13, 2009, two months before the deadline for discovery.  If Hunter believed that any of the defendants were withholding information or documents pertinent to her claims, the proper course of action would have been to bring a motion to compel the materials, not a motion for summary judgment without the materials.  As such, the Court cannot grant her any relief as it relates to claims of withheld discovery.

---

[19]     Rule 56(f) allows a Court to extend discovery deadlines "[i]f a party opposing [a motion for summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(f).

### 10. Conclusion

Hunter has failed to come forward with sufficient evidence to give rise to a genuine issue of material fact on her fraud claims under Minn. Stat. §§ 325D.09 and 325F.71. Accordingly, the HAI defendants' motions for summary judgment as to these claims should be granted and Hunter's motion for summary judgment on these claims should be denied.

### E. Implied Covenant of Good Faith and Fair Dealing Claim Against CFA and the HAI Defendants[20]

Hunter alleged that in entering into an agreement with defendants, she placed her trust in defendants that they would deal with her fairly and "not to scheme to entrap her by a 'Loan Packing Gap Insurance Fraud Scam,' while concealing inventory from other dealerships in order to inveigle her into the terms of a 5 year contract at 22.25%" and depriving her of any of the benefits to which she was entitled, i.e., the Z-Plan benefits. See Amended Complaint, ¶ 125. CFA argued that Hunter has not alleged a proper claim of implied covenant of good faith and fair dealing because she has failed to assert that defendants impeded her from performing the obligations under the Installment Contract. See CFA Mem. at p. 18. The HAI defendants joined in this argument. See HAI Mem. at p. 1 n. 1.

"Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not 'unjustifiably hinder' the other party's performance of the contract." In re Hennepin County 1986 Recycling Bond Litig., 540 N.W.2d 494, 502 (Minn. 1995) (citations omitted). The implied covenant, however, "does not extend to actions beyond the scope of the underlying contract." Id. at 503.

---

[20] This claim had already been dismissed against Ford. See July 21, 2009 Order [Docket No. 112] at p. 7.

Moreover, "Minnesota law does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing separate from the underlying breach of contract claim."  Medtronic, Inc. v. ConvaCare, Inc., 17 F.3d 252, 256 (8th Cir. 1994) (citations omitted); see also Orthomet, Inc. v. A.B. Medical, Inc., 990 F.2d 387, 392 (8th Cir. 1993) (finding that pursuant to Minnesota law, a cause of action for good faith and fair dealing "cannot exist independent of the underlying breach of contract claim.").

Hunter has not asserted that CFA and the HAI defendants engaged in conduct meant to keep her from completing the terms of the Installment Contract.  Instead, Hunter's implied covenant of good faith and fair dealing claim focuses on why the contract and its terms were unfair to her given their alleged deceptive practices surrounding the purchase of her used vehicle.  Stated otherwise, Hunter has not alleged that CFA and the HAI defendants kept her from performing on the contract.  Rather, she has challenged their actions with regards to its formation.  In any event, Hunter's claim cannot survive as she has failed to allege a breach of contract claim.

For all of these reasons, CFA and the HAI defendants' motions for summary judgment as they relate to Hunter's claim of breach of the implied covenant of good faith and fair dealing should be granted and her motion on this claim should be denied.

F.    **Claim Under the Truth in Lending Act, 15 U.S.C. § 1601, et seq. Against CFA and the HAI Defendants**[21]

With regards to her Truth in Lending Act ("TILA") claim, Hunter asserted that Carpenter and Ericksen, employed at HAI and CFA, originated and serviced private car loans and violated TILA and the accompanying regulations by failing to deliver accurate

---

[21]    This claim had already been dismissed against Ford.  See July 21, 2009 Order [Docket No. 112] at p. 7.

disclosures regarding the annual percentage rate, finance charges; and the amount financed.  See Amended Complaint, ¶ 141.

TILA was enacted "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair billing and credit card practices." 15 U.S.C. § 1601(a).  Section 1602(f) of TILA defines a creditor as:

> a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.

15 U.S.C. § 1602(f) (emphasis added).  Similarly, the applicable Regulation Z defines a creditor as: "[a] person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than 4 installments (not including a down payment), and (B) to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract."  12 C.F.R. § 226.2(a)(17)(i) (emphasis added).

In an consumer credit transaction other than an "open-ended" credit plan, a creditor must disclose: (1) the "identity of the creditor"; (2) the "amount financed" less any down payment and trade-in; (3) the "finance charge;" (4) the "annual percentage rate;" (5) the "total payments;" (6) the number, amount, and due dates or period of payments; (7) the total sale price; (8) descriptive explanations of specified terms—i.e., "finance charge" or "annual percentage rate"; and (9) where credit is secured, a

statement that the security interest has been taken; (10) list any percentage or dollar amount for a late fee; (11) a statement as to whether the consumer is entitled to a rebate of any financing charge upon prepayment of the contract early; and (12) a reference that the consumer can see the terms of the contract for any additional information about nonpayment, default, any required repayment before the scheduled date and prepayment refunds and penalties. 15 U.S.C. § 1638(a)(1)-(12). TILA requires creditors to make these disclosures prior to consummation of the transaction. 12 C.F.R. § 226.17(b).

Contrary to Hunter's assertion, the Installment Contract sets forth in separate boxes that the "**ANNUAL PERCENTAGE RATE**" of the loan was of 22.25%; that the "**FINANCE CHARGE** The dollar amount that the credit will cost you" was $8937.26; and that the "**AMOUNT FINANCED**" was $10,699.30. See Hunter Deposition, Ex. 4 (Installment Contract) at p. 1 (emphasis in original). Although not directly raised by Hunter, the Court also finds, after examining the Installment Contract, that it made all of the necessary disclosures under § 1638(a)(1)-(12). Id. at pp. 1-2. Hunter confirmed that Carpenter went over the "figures" of the Installment Contract with her. Id. at p. 109. The undisputed evidence in the record dictates the finding that the HAI defendants and CFA complied with the disclosure requirements of TILA and that summary judgment on this claim in their favor is appropriate.

### G. Plaintiff's Motion and Request for Sanctions for Utilizing the Court System as a Loan Sharking Arena in Violation of Civil Code § 1916.3 [Docket No. 136]; Plaintiff's Motion for Briefing Schedule/Hearing for a Permanent Injunction [Docket No. 139]; and Plaintiff's Motion for Citizen's Arrest of Dion Carpenter [Docket No. 211]

Hunter's Motion and Request for Sanctions for Utilizing the Court System as a Loan Sharking Arena in Violation of Civil Code § 1916.3, Motion for Briefing

Schedule/Hearing for a Permanent Injunction, and Plaintiff's Motion for Citizen's Arrest of Dion Carpenter should be denied as moot, in light of this Court's recommendation that defendants' motions for summary judgment regarding her suit should be granted in all respects.

<u>**RECOMMENDATION**</u>

For the reasons set forth above, it is recommended that:

1. Plaintiff's Motion and Request for Summary Judgment [Docket No. 131] be **DENIED**;

2. Plaintiff's Motion and Request for Sanctions for Utilizing the Court System as a Loan Sharking Arena in Violation of Civil Code § 1916.3 [Docket No. 136] be **DENIED** as moot;

3. Plaintiff's Motion for Briefing Schedule/Hearing for a Permanent Injunction [Docket No. 139] be **DENIED** as moot;

4. Defendant Citi Financial Auto and Tony Feell's Motion for Summary Judgment [Docket No. 156] be **GRANTED**;

5. Defendant Ford Motor Company's Motion for Summary Judgment [Docket No. 171] be **GRANTED**;

6. Motion of Hastings Automotive, Inc., Dion Carpenter and Doug Ericksen for Summary Judgment [Docket No. 178] be **GRANTED**; and

7. Plaintiff's Motion for Citizen's Arrest of Dion Carpenter [Docket No. 211] be **DENIED** as moot.

Dated:        July 28, 2010

s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

46

<u>**NOTICE**</u>

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 11, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this Rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **August 11, 2010**.